STATE

v.

Robert J. HALSTEAD.

No. 79–24–C.A.

Supreme Court of Rhode Island.

May 19, 1980.

Dennis J. Roberts, II, Atty. Gen., Henry Gemma, Jr., Asst. Atty. Gen., for plaintiff.

Charles J. Rogers, Jr., Providence, for defendant.

## OPINION

DORIS, Justice.

The defendant, Robert J. Halstead, was convicted by a jury in the Superior Court of murder in the first degree and of possessing a firearm. On appeal, he argues that the Superior Court lacked jurisdiction to try him, that the body of the victim should have been suppressed because the police lacked probable cause to arrest him, and that he was denied his right to counsel during a custodial interrogation. We find no substance to these arguments and affirm the judgment of the Superior Court.

On March 21, 1976, at 4:30 a. m., two officers of the Rahway, New Jersey police department, Paul Landolt and Edward

Hannan, were on patrol in a high crime area. While they were parked at an intersection, the officers observed a Ryder rental truck with Georgia license plates [1] travel through the intersection some fifteen to twenty miles per hour below the speed limit. As the truck passed in front of the police car, the occupants of the truck stared at the police for approximately five seconds, a length of time both officers thought to be unusually long. Because the officers had not often seen rental trucks in that neighborhood so late at night and thought it unusual that any vehicle would be traveling so slowly on that highway at that time of night, they decided to check the truck. The officers followed the vehicle for a short distance and then ordered the driver to stop the truck at the side of the road approximately one-half mile later. Officer Landolt approached the truck and asked the driver, Joseph Sciotto, for his license and the truck's registration. Sciotto gave Landolt his Rhode Island driver's license and an illegible copy of a Ryder rental contract. Officer Landolt advised Sciotto that he would be arrested unless he had a valid registration for the truck in his possession. When Sciotto could not produce the registration, the police officers ordered both Sciotto and the passenger, Robert J. Halstead, to get out of the truck. Officer Landolt then arrested Sciotto for not having the registration and informed him that the truck would be impounded because it was a hazard to traffic.[2] Upon being told that the truck would be impounded, Sciotto attacked Officer Hannan, striking him in

the face with his fist. Halstead then made a movement toward Officer Landolt who, believing Halstead was about to attack him, fired a warning shot, that stopped the altercation. At this time, Halstead, defendant in this appeal, was placed under arrest for assault. In a subsequent search of defendant, the police discovered two spent .45-caliber shell casings in his pocket.[3] The police, in accordance with their inventory procedures and in an effort to find the registration of the truck,[4] forced open the lock on the rear doors. Upon looking inside, they discovered the body of one Edward Palmisciano, which had a number of bullet wounds in it.[5]

While in Rahway on March 22, 1976, defendant made a written statement in the presence of three officers of the Providence Police Department. The officers later testified that although they had informed Halstead of his rights several times, he did not request an attorney. When defendant filled out a waiver of rights form prior to making the statement, however, he wrote "Yes" in response to a question asking whether he wanted an attorney. On March 25, 1976, Lieutenant Philip Bathgate of the Providence Police Department and several other officers went to Rahway to return defendant and Sciotto to Rhode Island. During the trip, defendant asked the police whether they had apprehended one Michael Diano. Lieutenant Bathgate informed defendant that they had done so and that they had also recovered the gun that had been used in the murder.[6] The defendant then

1. The truck had been rented by defendant in Rhode Island on the previous day.

2. The truck had stopped in a travel lane of the highway because there was no breakdown lane in that area. Officer Landolt testified that the truck could not be driven off the road because the curb was too high.

3. A test administered in New Jersey revealed that defendant also had gunpowder residue on both his hands.

4. Officer Landolt testified that police routinely inventory the contents of vehicles before impounding them and that rental trucks often contain registration information in pockets riveted to the inside wall.

5. A forensic pathologist who examined the body testified that he removed five .45-caliber bullets from the chest and neck area. He further testified that Palmisciano had been shot from close range and that massive bleeding resulting from the gunshot wounds had caused his death.

6. Michael Diano was one of the persons allegedly involved with defendant in the murder of Edward Palmisciano. After he was apprehended by the Providence police, Diano gave a statement to the police in which he admitted his complicity in the crime and identified Robert Halstead as the person who had shot Palmisciano. Diano also directed the police to a location on the Woonasquatucket Riv-

asked whether Diano had given a statement to the police and, after learning that Diano had done so, asked to read it. Upon arriving in Providence, the police consulted with their legal advisor who allowed Halstead and Sciotto to read Diano's statement. After reading Diano's statement and being advised of their rights, both Halstead and Sciotto informed the police that they too each wanted to make a statement. Halstead then confessed that he and several others had conspired to rob Edward Palmisciano, that as part of the robbery plan he shot and killed Palmisciano in Providence, and that when they were stopped in New Jersey he and Sciotto had been transporting Palmisciano's body to Pennslyvania in order to conceal the crimes.

The defendant subsequently was indicted on four counts: murder in the first degree, possession of a firearm, robbery, and conspiracy to rob. The trial justice denied defendant's motion to suppress the body but granted a judgment of acquittal on the last two counts on the ground that the state had not proved corpus delicti. The justice denied a motion for acquittal on the remaining counts, finding that the state had established corpus delicti with evidence independent of defendant's confession and that the confession, when subsequently admitted, established the jurisdiction of the court. The jury then convicted defendant of both charges, and he now appeals from the judgments of conviction in the Superior Court.

The first issue we consider is whether the Superior Court lacked jurisdiction to try defendant because the state allegedly failed to prove that the crimes had occurred within the territorial jurisdiction of the court. The defendant argues that the state offered no evidence other than his confession that the crimes had occurred in Providence and that the confession should not have been admitted because the corpus delicti had not been previously established by independent evidence. Contrary to defendant's argument, we concur with the findings of the

trial justice that the state introduced sufficient evidence to establish the corpus delicti of both crimes prior to the admission of the confession and that defendant's confession could be used in conjunction with other evidence to show the jurisdiction of the Superior Court.

■■■ Before it may obtain a conviction for a criminal offense, the state must prove corpus delicti beyond a reasonable doubt. *In re Pereira*, 111 R.I. 712, 714, 306 A.2d 821, 823 (1973); *State v. Maloney*, 111 R.I. 133, 138 n.1, 300 A.2d 259, 262 n.1 (1973). The corpus delicti comprises two elements: a penally proscribed act or injury and the unlawfulness of some person in causing the injury. LaFave and Scott, *Handbook on Criminal Law* § 4 at 16–17 (1972); 1 Wharton; *Criminal Law* § 28 at 142 (14th ed. 1978). In a homicide prosecution, the state must thus show that a person has died and that the death was caused by the criminal agency of another. The requirement of proving corpus delicti reflects a concern that an accused not be convicted when no crime has in fact been committed. *Commonwealth v. Johnson*, 235 Pa.Super. 185, 188, 340 A.2d 515, 516 (1975). To this end, a state may not rely solely on a defendant's confession in proving corpus delicti. As we have previously stated, "in [the] absence of some corroborative evidence tending to prove the corpus delicti, a confession or self-incriminating statement will not be admitted into evidence because such an uncorroborated statement is insufficient to prove [the] corpus delicti." *State v. Wilbur*, 115 R.I. 7, 13, 339 A.2d 730, 734 (1975). Only after the state has introduced some independent evidence of corpus delicti—evidence that the crime alleged has been committed by someone—may it introduce the confession of an accused. The state need not, however, prove corpus delicti beyond a reasonable doubt prior to introducing an extrajudicial confession. *Id.* at 14, 339 A.2d at 734; *State v. Boswell*, 73 R.I. 358, 363, 56 A.2d 196, 198 (1947). The independent evi-

---

er where divers recovered parts of a .45-caliber automatic pistol. A ballistics expert later testified that the gun barrel found in the river was

the one through which the bullets found in the body of Palmisciano had been fired.

dence need only be such that if believed, it would indicate that the crime charged had been committed by someone. *See State v. Wilbur*, 115 R.I. at 14, 339 A.2d at 734. Once a confession is admitted, it may be considered as corroborating evidence to prove corpus delicti beyond a reasonable doubt. *State v. Wheeler*, 92 R.I. 389, 391, 169 A.2d 7, 9 (1961).

■■■■■■ In the case before us, the state introduced ample evidence of corpus delicti prior to the admission of defendant's confession. The state first showed that the body of Edward Palmisciano had been found in a truck on a New Jersey highway, that five .45-caliber bullet wounds in the head and chest area of the victim caused his death, that the bullets had been fired from close range through a gun barrel that had been found in Providence, that the truck had been rented by defendant, that defendant had been in the van when the body was found, that defendant had two spent .45-caliber shell casings on his person when arrested and had gunpowder residue on his hands. In our opinion, the condition of the victim's body is consistent only with a homicide, and the discovery of the shell casings and gunpowder residue indicate that defendant discharged a firearm in his possession at some time shortly before his arrest. The state, having established corpus delicti, could properly introduce defendant's confession. The confession could then be used for any legitimate purpose—as corroborating evidence showing corpus delicti beyond a reasonable doubt, to identify the accused as the perpetrator,[7] or to prove the jurisdiction of the court.

■■■■■■ The defendant is incorrect in arguing that the jurisdiction of the Superior Court, like corpus delicti, must be established by independent evidence prior to the admission of his confession. As we have explained, the corpus delicti requirement is intended to prevent a state from convicting persons of nonexistent crimes on the basis of their confessions alone. The rule that a court may hear only those cases arising within its territorial jurisdiction, however, does not concern the question of whether a crime has in fact been committed. This is a limitation on the subject-matter jurisdiction of the Superior Court—a constraint imposed on the power of the Superior Court to adjudicate cases. A Superior Court will lack jurisdiction to hear a criminal case if the crime occurred beyond its territorial boundaries. This, obviously, raises a factual question that may be resolved at trial. To the extent that the valid exercise of the Superior Court's subject matter jurisdiction is dependent on a factual determination of where the crime occurred, the trial justice may await the full development of the state's evidence before ruling on a motion to dismiss. The jurisdictional question need not, as defendant urges, be resolved prior to trial. Such a requirement would constitute an impractical duplication of the trial itself. It is sufficient to prove jurisdiction if the evidence, as viewed by the trial justice, indicates that the crime occurred within the territorial jurisdiction of the court.

■■■■ In this case, the evidence clearly indicated that the crimes had occurred in Providence. The trial justice ruled that defendant's confession alone conclusively established the jurisdiction of the court to try him. We concur with the trial justice. We also note that the evidence introduced prior to the confession, though perhaps inadequate to show guilt beyond a reasonable doubt, would have been sufficient to support the Superior Court's exercise of jurisdiction.

The defendant further argues that the body of the victim should have been suppressed as the fruit of an unlawful arrest because the police lacked any reason to suspect defendant and Sciotto of having committed a crime and, therefore, did not have probable cause to stop them. We believe that both the seizure and the search conformed to the Fourth Amendment.

■■■■■■ In arguing that the body should have been suppressed because the New Jer-

---

7. The use of the confession as evidence of defendant's guilt, of course, assumes that defendant's constitutional rights have not been violated and that the rules of evidence allow it.

sey police lacked probable cause to stop the truck, defendant misapprehends the relevant law. When the police stopped the truck, they did not intend to arrest the occupants—they intended merely to check them over because the occupants appeared suspicious and the police thought that they might perhaps have been lost.[8] The initial seizure, therefore, was an investigatory stop, which differs from a full arrest both in the duration of the detention and in the quantum of suspicion necessary to conduct it. Probable cause is a prerequisite to a full arrest. Since *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), however, the Supreme Court has on several occasions sanctioned brief investigatory stops if they are based on a reasonable suspicion that the person detained is involved in criminal activity.

In *Terry*, the Supreme Court first considered the applicability of the Fourth Amendment to brief confrontations between citizens and police officers investigating suspicious circumstances. *Id.* at 4, 88 S.Ct. at 1871, 20 L.Ed.2d at 896. The issue framed by the *Terry* Court was whether it was always unreasonable for a

---

8. Officer Landolt testified as follows:
"Q. Did you see something at that time?
"A. Yes.
"Q. What did you see?
"A. A yellow Ryder Rental vehicle going southbound on U.S. 1.
"Q. Now, as you were sitting in your car, which way would this vehicle be going?
"A. As I was sitting in the car, it was traveling from my right to my left.
"Q. Do you know, as a police officer, what the speed limit on U.S. 1 is or was in March of 1976?
"A. Yes.
"Q. What was it?
"A. Forty-five miles per hour.
"Q. Now, this vehicle that you saw, this Ryder vehicle that you say [sic] go from right to left, was there anything unusual about that vehicle as you saw it at that time?
"A. Yes, there was.
"Q. What was that?
"A. As the vehicle was going very slow, and both occupants of the vehicle seemed to gaze in the direction, seemed to look right in my direction from the cab of the rental truck.
"Q. Was this unusual sir?
"A. Yes.
"Q. Why was it unusual?
"* * *
"A. Well, most of the trucks that I have observed going down Route 1 usually are doing the speed limit. This vehicle struck me, in my mind, as possibly being lost, because of its speed, or struck me as suspicious. Both occupants of the vehicle looking my way, plus the fact that the vehicle was traveling in what looked to me to be a lot slower than the speed limit.
"Q. How fast did it appear to you that the vehicle was traveling?
"A. Approximately twenty-five, thirty miles per hour.
"Q. As a result of that vehicle going past you at that rate of speed, and both the driver and occupant looking at you, what did you do?

"A. I conferred with my partner at that point, and we both agreed that we would check out this vehicle."
Officer Hannan testified as follows:
"Q. And were you in a police vehicle at that time?
"A. Yes.
"Q. Who was the driver of that vehicle?
"A. Patrolman Paul Landolt.
"Q. And where were you?
"A. I was in the front right hand seat, sir.
"Q. And did you have occassion [sic] to see a yellow truck pass in front of you?
"A. Yes, I did.
"Q. And was anything about that truck unusual?
"A. Yes, there were.
"Q. Tell the court and the jury what was unusual about that truck.
"A. Yes, what appeared unusual to us, or to myself, was the speed the truck was traveling on that highway that evening, the hour, and as the two—as the truck passed in front of us, the two occupants sitting in the front seat glanced in our direction a long glance, towards our radio car.
"Q. Now, you say something was unusual concerning the speed that the truck was traveling at. What speed was it traveling at?
"A. I would estimate about twenty-five miles per hour, sir.
"Q. And why is that unusual?
"A. Well, the speed limit on the highway is 45 and we have a problem keeping the speed at that. Usually vehicles go much faster.
"Q. As a result of what you testified to, did you and your partner decide to do something?
"A. Yes, we did.
"Q. And what did you do?
"A. Well, I—as the truck passed in front of us, you might say simultaneously I looked at Patrolman Landolt, he looked at me, and we stated that perhaps we were going to stop the vehicle."

police officer to seize a person and to search him for weapons absent probable cause to arrest.[9] *Id.* at 15–16, 88 S.Ct. at 1877, 20 L.Ed.2d at 902. The Court held that a brief detention of this sort—a "stop and frisk"—was constitutional only if it conformed to the "Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.* at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. The Court stated that the reasonableness of a particular stop and frisk must be determined by balancing the governmental interests in seizing or searching a person against the encroachment on individual rights that the stop and frisk entails. After balancing the state's interest in crime prevention and detection, as well as in the safety of the police officer, against the right of a citizen to be free from unwarranted police interference with his liberty, the *Terry* Court held that a stop and frisk was permissible only if the police officer had a reasonable belief that the person was engaged in criminal activity and was armed and dangerous. *Id.* at 30, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911.[10] The Court cautioned that the police conduct must conform to an objective standard and that police must be able to advance "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the stop and frisk]." *Id.* at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

The actual holding in *Terry* was rather narrow, requiring both a reasonable suspicion of criminal activity as well as a reasonable belief that a suspect was armed and dangerous.[11] The Court, in subsequent opinions, however, has gradually omitted the requirement that a police officer reasonably believe prior to the stop that a suspect is armed and dangerous. Under the Court's evolving stop and frisk analysis, a policeman may conduct an investigatory stop solely on the basis of a reasonable suspicion of criminal activity. In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), although the police officer had a reasonable belief that the suspect was armed, the Court stated:

> "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617.

The Court has continued to test the reasonableness of brief detentions by balancing the governmental interests against the right of the individual to be free from arbitrary intrusions by the police. The Court has also adhered to the requirement that a police officer's reasonable suspicion of criminal activity arise from specific and articulable facts and the reasonable inferences that can be drawn from them. *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667–68 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 880, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 616 (1975) (quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

**9.** The Court rejected the contention that the Fourth Amendment was inapplicable because a "stop and frisk" was something less than a "technical arrest" or a "full-blown search," and stated that even a brief detention and limited search constituted a "serious intrusion upon the sanctity of the person" and implicated the Fourth Amendment rights of the suspect. *Terry v. Ohio*, 392 U.S. 1, 16–17, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889, 903 (1968).

**10.** The safety of the police officer was an important consideration in upholding the stop and frisk. The *Terry* Court was especially concerned that an officer be able "to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpect-

edly and fatally be used against him." *Terry v. Ohio*, 392 U.S. at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 907. For this reason, a cursory search of a suspect for weapons was permissible. Because the Fourth Amendment was implicated, however, the search had to be confined to a pat-down of a suspect's outer clothing for objects that could be weapons. *Id.* at 30, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911.

**11.** The Court reserved the question of whether a police officer could conduct an investigative seizure with less than probable cause for the "purposes of 'detention' and/or interrogation." *Terry v. Ohio*, 392 U.S. at 19 n.16, 88 S.Ct. at 1879 n.16, 20 L.Ed.2d at 905 n.16.

In *Brignoni,* the Court considered whether officers of the Border Patrol near the Mexican border could stop a car and question the occupants simply because they appeared to be of Mexican ancestry. *United States v. Brignoni-Ponce,* 422 U.S. at 876, 95 S.Ct. at 2578, 45 L.Ed.2d at 614. Although finding the stop unreasonable, the Court declared that an investigatory stop could be conducted on the basis of reasonable suspicion alone. The Court stated that *Terry* and *Adams* together established "that in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search." *Id.* at 881, 95 S.Ct. at 2580, 45 L.Ed.2d at 616.

In *Brown,* the Supreme Court considered whether police could detain a person without having a suspicion of criminal conduct or a belief that the suspect was armed. Because the police could articulate no facts to justify their action, the *Brown* Court held that the detention violated the suspect's Fourth Amendment rights. The Court stated, however, that a brief detention for questioning without probable cause to arrest would be permissible as long as the police had "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas,* 443 U.S. at 47, 99 S.Ct. at 2641, 61 L.Ed.2d at 362. In the absence of an objectively supportable reasonable suspicion, therefore, police may not stop a person on a mere hunch that the detention will produce some evidence of criminal activity. This, essentially, was the reasoning employed by the Supreme Court in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), a case that is somewhat similar to the one now before us.

In *Prouse,* a police officer, while making a random vehicle stop to check the driver's license and registration, discovered marijuana in the car and arrested the owner, who was a passenger in the car. The arresting officer testified that prior to the stop "he had observed neither traffic or equipment violations nor any suspicious activity, and that he made the stop only in order to check the driver's license and registration." [12] The Supreme Court found that the reasons advanced by the state did not warrant the intrusion on constitutional rights that the random stop entailed. *Id.* at 659, 99 S.Ct. at 1399, 59 L.Ed.2d at 671. Accordingly, the *Prouse* Court held that a random license and registration check would be unreasonable "except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law * * *." *Id.* at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673.

Neither *Prouse* nor any other opinions of the Supreme Court constrain us to hold, as defendant seems to argue, that a seizure based on less than probable cause is necessarily unconstitutional. It is clear from these opinions that a police officer may conduct an investigatory stop, provided he has a reasonable suspicion based on specific and articulable facts that the person detained is engaged in criminal activity. This court has previously held that such a stop must be available to police as an intermediate response when an individual's conduct, though suspicious, does not give police probable cause to arrest. *State v. Ramsdell,* 109 R.I. 320, 322–23, 285 A.2d 399, 402 (1971). Our present inquiry, therefore, must initially focus on whether the New Jersey police officers had a reasonable suspicion to believe that defendant and Sciotto were engaged in criminal activity at the time the truck was stopped. Viewing the totality of the circumstances of which the officers were apprised at the time of the stop, we believe that they did.

We bear in mind that we must be realistic in considering whether the police were justified in their suspicion of de-

---

12. The officer testified: " 'I saw the car in the area and wasn't answering any complaints, so I decided to pull them off.' " *Delaware v.* *Prouse,* 440 U.S. 648, 650–51, 99 S.Ct. 1391, 1394, 59 L.Ed.2d 660, 665 (1979).

fendant. A reasonable suspicion, like probable cause, is not an abstract principle to be considered in a vacuum; it involves a pragmatic analysis from the vantage point of a prudent, reasonable police officer in light of the facts known to him at the time of the detention. *See United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976); *United States v. Davis*, 458 F.2d 819, 821 (D.C.Cir.1972) (per curiam). Any number of factors may contribute to a finding of reasonable suspicion of criminal activity. Additionally, factors that alone do not create a reasonable suspicion may, when combined, warrant a reasonable suspicion of criminal activity. *See* Ringel, *Searches & Seizures, Arrests and Confessions* § 13.4 at 13–20 (1979). Among the factors that may contribute to a reasonable suspicion of criminal activity are: the location in which the conduct occurred, *United States v. Magda*, 547 F.2d 756, 768 (2d Cir. 1976) (reputation of area an articulable fact on which police may rely), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *Flores v. Superior Court*, 17 Cal.App.3d 219, 223, 94 Cal. Rptr. 496, 498 (1971) (act of suspect to be examined in environment in which it took place); the time at which the incident occurred, *United States v. Constantine*, 567 F.2d 266, 267 (4th Cir. 1977) (per curiam) (officer justified in stopping unfamiliar person in high-crime area late at night), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1492, 55 L.Ed.2d 520 (1978); *People v. Damaska*, 404 Mich. 391, 394, 273 N.W.2d 58, 59 (1978) (per curiam) (lateness of hour one factor supporting stop of person driving from business parking lot); the suspicious conduct or unusual appearance of the suspect, *State v. Woods*, 121 Ariz. 187, 189, 589 P.2d 430, 432 (1979) (defendant ran from store while holding something underneath his jacket); *United States v. Purry*, 545 F.2d 217, 220 (D.C.Cir.1976) (excited appearance of defendant one factor giving rise to reasonable suspicion); and the personal knowledge and experience of the police officer, *United States v. Magda*, 547 F.2d at 758–59 (conduct of suspect as well as locality and experience of officer created reasonable suspicion); *see Terry v. Ohio*, 392 U.S. at 27, 88

S.Ct. at 1883, 20 L.Ed.2d at 909 (officer entitled to view conduct in light of his experience); *United States v. Simpson*, 400 F.Supp. 1396, 1399 (S.D.N.Y.1975) (behavior of defendants viewed by experienced officers warranted conclusion that crime was imminent, *aff'd*, 542 F.2d 1166 (2d Cir. 1976); Ringel, *supra*, § 13.4(a) at 13–21 to 13–23 (reasonable suspicion may derive from specific facts viewed in conjunction with experience of police).

The circumstances of this case differ from those of *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Prouse*, the police officer decided to stop the car because it was in his area and he was not answering any complaints at the time. *Id.* at 650–51, 99 S.Ct. at 1394, 59 L.Ed.2d at 665. The Court condemned this sort of stop because it was not predicated on a factual basis, which is necessary to prevent the arbitrary exercise of the officer's discretion. *Id.* at 661, 99 S.Ct. at 1400, 59 L.Ed.2d at 672. In the case before us, however, there were several specific and articulable facts that prompted the officers to stop the truck. The police observed the truck at approximately 4:30 a. m. in a neighborhood known to them as a high-crime area. The speed at which the truck was traveling—some fifteen to twenty miles per hour less than the speed limit—differed substantially from the normal traffic speed for that hour. The police also knew that it was unusual to see a rental vehicle in that neighborhood so late at night. Additionally, as the truck passed the police, both occupants simultaneously "gawked" at the police for what seemed to the police to be an unusually long time.

These facts, when considered from the vantage point of an experienced police officer whose duty it is to be attuned to unusual circumstances, could very well create a reasonable suspicion that the occupants of the truck were engaged in some sort of criminal activity. The personal knowledge and experience of the officers are important factors that may allow an officer reasonably to infer from observation of otherwise innocuous conduct that crimi-

nal activity is imminent or is taking place. In light of the officers' knowledge of the character of the neighborhood and of the usual traffic patterns for that time of night, as well as the unusual behavior of the occupants, we believe that their suspicions were reasonable. Furthermore, the officers intended only to ask for the driver's license and for the registration of the truck. In doing so they confined their intrusion on the liberty of the occupants to that minimally necessary to determine the driver's identity and the ownership of the truck. *See Adams v. Williams*, 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617. Given the reasonable suspicion that the officers possessed, in this instance the state's interest in crime detection outweighed the individual's right to be free from the intrusions on his liberty that accompanied the investigatory stop. The officers were therefore entitled to stop the truck in order to ascertain the identity of the occupants and to obtain the registration of the truck. *Adams v. Williams*, 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617.

▮▮▮▮ After the police discovered that Sciotto could not produce a valid registration for the truck, they were entitled to arrest him for that offense and to order both occupants from the truck. N.J.Stat. Ann. §§ 39:3–29, 39:10–6 (West 1973); see *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 337 (1977)

(per curiam) (police making a valid vehicle stop may order occupants out of vehicle). The defendant's threatening movement toward Officer Landolt during the subsequent scuffle between Sciotto and Officer Hannan provided probable cause to arrest him. Because the truck was parked in a travel lane of the highway, it posed a hazard to other traffic and the officers were obliged to have it removed and impounded.[13] As part of the impounding procedure, the Rahway police routinely inventory the contents of a vehicle prior to allowing it to be towed away. This procedure is entirely consistent with the Fourth Amendment. *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000, 1009 (1976). Accordingly, the police officers did not violate defendant's Fourth Amendment rights when they opened the rear of the truck while looking for evidence of ownership and attempting to inventory the personal property inside the truck.[14]

▮▮▮▮ The defendant's final argument, though somewhat vague, centers on whether, by filling out the waiver-of-rights form in New Jersey, defendant intended to request an attorney. Prior to making his statement in New Jersey, defendant told the police that he did not want an attorney. A police officer then produced a waiver-of-rights form and read the questions on the form[15] to defendant, who repeated his de-

---

13. The officers testified that they would have impounded the truck regardless of the scuffle because neither occupant had produced a registration certificate.

14. The New Jersey Supreme Court has stated that police officers may search a car for things related to the arrest; if an operator cannot show proof of registration, the police may look for evidence of ownership. *State v. Boykins*, 50 N.J. 73, 77, 232 A.2d 141, 143 (1967).

The trial justice also found that the conduct of Sciotto and Halstead after they were informed that the truck would be impounded created an "irresistible suspicion" that the truck contained evidence of criminal activity and gave the police probable cause to search the truck. Because we find that the police could enter the truck to inventory its contents, we need not consider whether the conduct of the occupants created probable cause to search the truck.

15. All other questions on the form would have required an affirmative answer to waive one's constitutional rights. The questions were as follows:

1. "I wanted [sic] to advise you that you have a right to remain silent, and that you do not have to make an oral or written statement to me concerning this matter. Do you understand that?
2. "I must advise that anything you do— that you do [sic] say to me can and will be used against you at anytime in the future, and this includes a court of law. Do you understand that?
3. "I must advise you that you have the right to have an attorney present, if you so desire during this questioning. Do you understand that?
4. "I must advise you that if you cannot afford an attorney and desire to have one present during this questioning, then I will arrange for the court to appoint one for you,

sire not to have an attorney. The officer then gave defendant the form to read and to sign. It was at this time that defendant wrote "Yes" following the question that asked whether he wanted an attorney. The defendant also wrote "Yes" after each of the other questions on the form, including the one asking whether he was willing to answer any police inquiries. Immediately after signing the waiver form, defendant informed the police that he wanted to make a statement. At no time, either when he signed the form or wrote the statement, did defendant make any verbal request for an attorney. Considering defendant's response on the waiver form in light of these circumstances, we find that the possibility could exist that defendant never intended to request counsel. Because we are dealing with a constitutional right, however, we assume for the purpose of argument that defendant intended to request counsel by writing "Yes" on the waiver form. Even assuming this, we must now consider whether defendant later waived his rights. Although a criminal suspect may, during a custodial interrogation, terminate the questioning by requesting an attorney, *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 723 (1966), the request does not preclude the suspect from subsequently waiving his right to counsel. *Brewer v. Williams*, 430 U.S. 387, 405–06, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424, 441 (1977); *State v. Cline*, R.I., 405 A.2d 1192, 1199–1200 (1979). A waiver of a constitutional right requires that a suspect intentionally relinquish or abandon a known right. The state has the burden of proving that the person has knowingly, voluntarily, and intelligently waived the right; and a court will not presume that a waiver has occurred. *Johnson v. Zerbst*, 304 U.S. 458,

464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938); *State v. Innis*, R.I., 391 A.2d 1158, 1163 (1978).

 A waiver of constitutional rights, however, need not be expressed verbally. *United States v. Montos*, 421 F.2d 215, 224 (5th Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970); *People v. Brooks*, 51 Ill.2d 156, 164, 281 N.E.2d 326, 332 (1972). If a person has been apprised of his constitutional rights and understands them, he can waive those rights by his conduct. A waiver may be inferred if a suspect acts in a manner that is inconsistent with the exercise of his rights, such as by volunteering information to the authorities without the benefit of counsel when he is aware that he need not do so. *Griffin v. Superior Court*, 26 Cal. App.3d 672, 697, 103 Cal.Rptr. 379, 395 (1972); *People v. Brooks*, 51 Ill.2d at 164, 281 N.E.2d at 332; *Commonwealth v. Johnson*, 3 Mass.App. 226, 230, 326 N.E.2d 355, 358 (1975). Even after a suspect has requested an attorney, he may still waive his constitutional rights if he knowingly, voluntarily, and intelligently chooses to speak to the police. *State v. Graham*, 59 N.J. 366, 376, 283 A.2d 321, 327 (1971); *see State v. Cobbs*, 164 Conn. 402, 421–22, 324 A.2d 234, 245, *cert. denied*, 414 U.S. 861, 94 S.Ct. 77, 38 L.Ed.2d 112 (1973).

 In the case before us, defendant knew and understood his *Miranda* rights. Despite being informed of his rights on several occasions, defendant repeatedly stated that he did not want an attorney. It was only by his response on the waiver form that defendant expressed any desire to consult with an attorney. Immediately after defendant signed the form, however,

---

and the questioning will not take place until you have consulted with such an attorney. Do you understand that?
5. "I must advise you that you have the right to speak with your attorney even before the questioning commences. Do you understand that?
6. "Now after explaining all those Constitutional rights to you, do you want an attorney to be present when I commence questioning you?

7. "I must also tell you that if at any time you do not wish to answer any questions, then you may tell me this, and I will stop the interview immediately. Do you understand that?
8. "Are you willing to answer the questions that I ask you truthfully and to the best of your ability, after having been told of your Constitutional rights in this matter?
9. "Are you willing to have the questions and answers reduced to typewritten form?"

he requested a piece of paper, saying that he wanted to write out a statement for the police. The police asked no questions of defendant between the time he filled out the waiver form and the time he made the statement. We are not here confronted with the question of continued police interrogation of the sort condemned in either *Miranda v. Arizona*, 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723, or *Brewer v. Williams*, 430 U.S. at 404–05, 97 S.Ct. at 1242, 51 L.Ed.2d at 439–40. What we are dealing with is a statement voluntarily made by defendant without any prompting by the police. The state introduced considerable evidence that defendant knew the extent of his constitutional rights prior to making the statement. In light of this evidence, we conclude, as the trial justice implicitly did by admitting the statement, that defendant knowingly, voluntarily, and intelligently waived his right to remain silent and his right to counsel by making the statement to the police.

 As a reviewing court, we owe great deference to the trial justice's findings of fact. *State v. Cline*, R.I., 405 A.2d 1192, 1196 (1979). The implicit finding of waiver now before us, like the factual findings on a motion to suppress, will not be reversed unless it is clearly erroneous. *See State v. Cline*, R.I., 405 A.2d at 1196. Considering the circumstances in which the statement was given, the trial justice could find that the defendant had waived his rights by making the statement. After reviewing the evidence, we cannot say that the trial justice was clearly erroneous, and thus we affirm his decision to admit the statement.

The defendant's appeal is denied and dismissed, the judgments of conviction are affirmed, and the case is remanded to the Superior Court.