STATE

v.

**William HOLDSWORTH.**

No. 99–468–C.A.

Supreme Court of Rhode Island.

June 6, 2002.

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

This appeal challenges: (1) the Superior Court's denial of a criminal defendant's motion to suppress evidence that he was carrying a gun on his person; and, (2) the court's handling of the defendant's waiver of his right to counsel after the trial justice became aware that the defendant apparently suffered from mental-health problems. The defendant, William Holdsworth

(defendant or Holdsworth), appeals from a judgment of conviction in the Superior Court for possession of a firearm without a license. He contends that the trial justice erred in denying his motion to suppress the evidence of a gun that a police officer, conducting a patdown search, found in the knapsack the defendant was carrying. He also alleges that, after the suppression hearing, the trial justice failed to determine: (a) whether the defendant was competent to make a knowing and intelligent waiver of his right to counsel; and, (b) whether, before waiving his right to counsel and proceeding to trial *pro se*, he was advised of the potential sentence that he could receive if he were convicted on the gun-possession charge.

After a prebriefing conference, a single justice of this Court ordered the parties to show cause why the issues raised by this appeal should not be summarily decided. Because they have not done so, we proceed to decide the appeal at this time.

## Denial of the Motion to Suppress

Before trial, defendant filed a motion to suppress the evidence that he was carrying a gun in his knapsack, alleging that he was the victim of an illegal search. At the suppression hearing, only the arresting officer and defendant testified. The officer testified that, at the July 10, 1998, roll call for the Providence Police Department, he received a letter from a community police sergeant indicating that defendant was "having words" with his landlord and that the landlord was concerned for his safety because of threats defendant had uttered. The letter provided a physical description of defendant and stated that the police had arrested him in the past for carrying a .380–caliber automatic handgun. The arresting officer testified that, after receiving the letter, he recalled seeing a flyer posted at the station about a year earlier that contained a picture of defendant, to-gether with statements from individuals "that he [defendant] always carried a gun in his knapsack and that police had never found the gun." After roll call, the officer obtained a copy of the flyer, which contained a photo of defendant, to take on his patrol. The officer also testified that he learned that the police previously had arrested defendant for carrying an automatic weapon, but he did not know the outcome of that case.

Approximately forty-five minutes after the roll call, the officer, while on patrol, spotted defendant walking through a parking lot at Elmwood and Lexington Avenues in Providence, with a green knapsack slung over his shoulder. The officer testified that he drove to the parking lot where defendant was walking, pulled alongside him, and called his name. The defendant stopped and the officer got out of his cruiser and asked him about being evicted. The defendant acknowledged that his landlord was trying to evict him, but said "I'm not going without a fight." The officer then asked him whether he owned any weapons, and defendant said that he did. He then asked defendant whether he was carrying a weapon on his person, and defendant said that "he didn't want to answer that question." The officer then asked defendant whether he had any objections to a patdown, to which "he [defendant] didn't really say anything. He just threw his hands up in the air as if to say go ahead." The officer immediately patted down the outside of the knapsack until he felt a hard object at the bottom, which he thought was a pistol. The officer held onto the object and, as he started to reach inside the bag, defendant said, "Oh you found it." The officer then reached into the bag, removed the gun, and placed defendant under arrest. According to the officer, the gun, which was loaded, was a .380–caliber automatic. The defendant

testified that he did not give the officer permission to search him. He said that he "would never be that stupid." According to defendant, the officer searched him despite his protestations and objections, and then found the gun inside the knapsack. The defendant also denied that he ever threatened his landlord with any harm.

After the hearing, the hearing justice denied defendant's motion to suppress this evidence. In denying the motion, the hearing justice distinguished the facts in this case from an earlier case involving similar charges in which the court had granted this same defendant's motion to suppress. The hearing justice noted that, in the earlier case, the officer who had seized a weapon from defendant's person had done so after receiving an anonymous tip. But in that case the officer had "walked up to the defendant and just started to feel his bag without any preliminaries whatever." Here, however, the hearing justice found that the officer possessed information (from a police sergeant) that the authorities believed defendant possessed several firearms, the officer had a right to rely on that information in the course of his patrol, and that he was justified in stopping and questioning defendant when he saw him. Furthermore, the court found that the officer's version of the events surrounding the search of defendant's bag was "more probably true than that which is offered by Mr. Holdsworth." As a result, the court found that defendant "voluntarily acquiesced to the search." The court concluded by stating:

> "[T]here was an articuable [sic] reason for this officer to have probable cause that a crime may have been committed in his presence based on his legal authority to rely on the information presented in the communication of the Providence Police to the roll call on the 10th of July particularly based on information generated on the 9th."

The court found that defendant "did, in fact, consent to the search, that his acquiescence in assuming a position of submission to the officer was sufficient to convey to the world and to this officer that he was consenting to this search * * *." Accordingly, the hearing justice concluded "that this search was appropriate and within the constraints placed upon law enforcement authorities with regard to warrantless searches pursuant to the Fourth Amendment." The defendant has not challenged this finding on appeal, thus mooting his reasonable-suspicion argument concerning the validity of the patdown search. Nevertheless, even if the search had not been consensual, the officer, we hold, still acted reasonably.

The defendant's first assignment of error is that the trial justice erred in denying his motion to suppress the gun that the police officers found in his knapsack. Citing precedents from the United States Supreme Court, defendant argues that the police officer lacked any reasonable suspicion that he had committed a crime. He contends that his behavior when the officer stopped him "was *completely* innocuous" and that "no reasonable person possibly could have concluded that any crime had been committed or was imminent." The state maintains that the search was justified under the facts of the case.

"When reviewing an alleged violation of a defendant's constitutional rights, this Court 'must make an independent examination of the record to determine if [the defendant's] rights have been violated.'" *State v. Abdullah*, 730 A.2d 1074, 1076 (R.I.1999) (per curiam) (quoting *In re John N.*, 463 A.2d 174, 176 (R.I. 1983)). "We review a trial justice's determination of the existence or nonexistence of probable cause or reasonable suspicion

on a *de novo* basis." *Abdullah,* 730 A.2d at 1076.

■ The general rule is that "a police officer may conduct an investigatory stop, provided [the officer] has a reasonable suspicion based on specific and articulable facts that the person detained is engaged in criminal activity." *Id.* (quoting *State v. Halstead,* 414 A.2d 1138, 1147 (R.I.1980)). A police officer may initiate "an investigatory stop of an individual whom a police officer reasonably suspects (1) has engaged in wrongdoing, and (2) may be armed and thus dangerous to the officer or others * * * [in order to conduct] a limited and self-protective patdown search of the suspect's outer clothing." *State v. Black,* 721 A.2d 826, 829–30 (R.I.1998) (citing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968)).

In *Abdullah,* we stated:

"Numerous factors exist which may contribute to a finding of reasonable suspicion of criminal activity. * * * Some of the factors * * * include the location in which the conduct occurred, the time at which the incident occurred, the suspicious conduct or unusual appearance of the suspect, and the personal knowledge and experience of the police officer." *Abdullah,* 730 A.2d at 1077.

■ Here, the officer who conducted the patdown search had received information at roll call that defendant possibly possessed several firearms, that his landlord was attempting to evict him from his apartment, and that he had threatened his landlord. The officer also obtained information that defendant "always carried a gun in his knapsack." The officer, on the alert for this individual, caught sight of defendant in the area shortly thereafter. He observed defendant, who fit the description he had received earlier, walking with the knapsack slung over his shoulder in the general area of his apartment. He

then drove over to defendant and began questioning him. Ultimately, he patted down his knapsack and felt the weapon inside. Given the information that the officer had received about this defendant, "especially when viewed from the perspective of a trained and experienced law enforcement officer," we conclude that the officer possessed a reasonable suspicion that defendant was carrying a concealed weapon. *Abdullah,* 730 A.2d at 1077. Thus, the trial justice did not err in refusing to suppress the gun.

## Adequacy of Proceedings Before Defendant's Waiver of Counsel

"[I]n circumstances raising legitimate doubts about a defendant's mental condition [at a probation-revocation hearing]," *State v. Chabot,* 682 A.2d 1377, 1380 (R.I. 1996), "[w]e previously have determined that a defendant is subjected to a heightened standard of competency when he attempts to waive counsel and appear *pro se.*" *State v. Thomas,* 794 A.2d 990, 994, 995 (R.I.2002) (holding that, notwithstanding applicant's disclosure during plea colloquy that he was "off" his medication, applicant for post-conviction relief was mentally competent when he pled nolo contendere to various charges, noting that the applicant "was at all times represented by counsel" and that "not a scintilla of evidence" indicated that he was laboring under a mental disability during the plea hearing).

In this case, defendant's second claim of error is that the trial justice erred in failing to inquire sufficiently about his psychiatric condition before deciding that defendant's waiver of counsel was knowing and intelligent. The defendant contends that the trial justice failed to inquire about defendant's competency to waive counsel as required by *Chabot.* Instead of engag-

ing in such an inquiry, defendant argues, "the trial court's examination was confined to a single question asking defendant whether he believed himself capable to represent himself despite his mental illness." The defendant also maintains that the trial justice erred in failing to determine whether his waiver of counsel was voluntary because he was not made aware of the potential sentence that the court could impose upon him for the charge he was facing in accordance with *Chabot.*

Before trial began, defendant expressed his desire to discharge his court-appointed counsel and to proceed to trial *pro se.* As a result of defendant's request, the following colloquy took place between the court and defendant:

"The Court: I have been informed at a pretrial conference in anticipation [of] beginning this case today that Mr. Holdsworth wishes to discharge the services of Mr. Levy and proceed pro se, is that correct, Mr. Holdsworth?

"The Defendant: He is going to act as a standby. He is going to act as a standby lawyer because I'm going to need some kind of legal presence, but I'm pretty much going to act as my attorney.

"The Court: In order to do that officially, you have to listen to the question. The question is if you wish to discharge Mr. Levy as your attorney; is that correct?

"The Defendant: Yes.

"The Court: Do you feel you're capable of conducting your own defense in this matter?

"The Defendant: Yes.

"The Court: And we heard some brief testimony yesterday in pretrial motions that you are a recipient and have been from time to time a patient at the Providence Mental Health Center; is that correct?

"The Defendant: That is correct, yes, sir.

"The Court: All right. Now, to me, that would indicate the diagnosis by some competent official of some degree of mental disability. Having said that and making that assumption, do you feel that you are competent to represent yourself in this case?

"The Defendant: Yes.

"The Court: Do you understand that in order to do this, you will be given no consideration by this Court with regard to your perceived lack of Rules of Evidence or practice and procedure?

"The Defendant: I have no problem with that.

"The Court: You will be held to the same standard as Mr. Dawson in this case even though he has had the benefit of legal training. Do you understand that?

"The Defendant: Good sense is good law.

"The Court: The Sixth Amendment gives you the right to represent yourself in this case if the Court believes you are qualified and capable to do so. Are you requesting that Mr. Levy be allowed to be your standby counsel in this case?

"The Defendant: Yes, I am going to need some kind of standby, somebody to, you know, hold my hand.

"The Court: Well, you understand he will not be speaking on your behalf in this capacity but will be available to you for discussion on legal strategy and practice and procedure. Do you understand that?

"The Defendant: That's fine.

"The Court: He will not be allowed to question people and he will not offer objections on your behalf. Do you understand that?

"The Defendant: That's fine.

"The Court: He will also not be able to cross-examine or examine witnesses or make argument on your behalf.

"The Defendant: I have no problem with that * * *."

Thereafter, the trial justice determined that defendant could represent himself. He said:

"[T]he Court will find as a fact that based on the testimony that you gave yesterday and your articulation of answers from the questions put to you and the general manner in which you conducted yourself in addition to your request in exercising your Sixth Amendment right to represent yourself, the Court will accept your pro se representation in this case * * *."

Thereafter, the trial proceeded, and the defendant subsequently was found guilty of carrying a pistol without a license.

■ "The Sixth Amendment to the United States Constitution provides that 'in all criminal prosecutions, the accused shall enjoy the right to * * * have the Assistance of Counsel for his defence.' The Sixth Amendment guarantees a defendant's 'right to represent himself or herself in a criminal trial.'" *State v. Briggs*, 787 A.2d 479, 485 (R.I.2001) (quoting *State v. Gatone*, 698 A.2d 230, 240 (R.I.1997) and (citing *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562, 566 (1975)). This Court has held that, although a defendant may waive the right to counsel and proceed *pro se*, "such a waiver must be given voluntarily, knowingly, and intelligently." *Chabot*, 682 A.2d at 1379. In determining the validity of the waiver, we "look[ ] to the totality of the circumstances." *Id.* at 1379–80.

■ But when the circumstances existing at the time of the purported waiver create "legitimate doubts about a defendant's mental condition," *id.* at 1380, it then becomes

"incumbent upon the trial justice to conduct a more searching inquiry of defendant's then existing mental health and physical condition and, if that inquiry raise[s] further questions concerning defendant's competency to waive counsel, to order that defendant undergo a psychiatric evaluation in regard to his [or her] competency to waive counsel and to defend himself [or herself] * * *." *Id.*

In considering whether a defendant who has a history of mental-health problems— or who exhibits the same before the court—is capable of voluntarily, knowingly, and intelligently waiving his or her right to counsel, the trial justice should consider the following factors:

"(1) the background, the experience, and the conduct of the defendant at the hearing, including his age, his education, and his physical and mental health; (2) the extent to which the defendant has had prior contact with lawyers before the hearing; (3) the defendant's knowledge of the nature of the proceeding and the sentence that may potentially be reimposed; (4) the question of whether standby counsel has been appointed and the extent to which he or she has aided the defendant before or at the hearing; (5) the question of whether the waiver of counsel was the result of mistreatment or coercion; and (6) the question of whether the defendant is trying to manipulate the events of the hearing." *Chabot*, 682 A.2d at 1380.

Indeed, even in a case that does not involve a defendant who may be suffering from mental-health problems, the above-mentioned factors nevertheless can be used as a guide in determining the validity of a defendant's waiver of counsel. *Briggs*, 787 A.2d at 486.

In this case, however, defendant testified at the suppression hearing that he was receiving Social Security disability benefits as a result of his mental-health problems. He also testified that he had received mental-health counseling. During the court's discussions with defendant about his desire to represent himself, the trial justice noted that defendant had received mental-health counseling. The trial justice even remarked that defendant probably had been diagnosed "by some competent official of [*sic*] some degree of mental disability." Nevertheless, that was the extent of the court's inquiry regarding the present state of the defendant's mental health. The court did not inquire whether defendant still was receiving mental-health counseling, whether he was taking any medications for mental disability, or whether his mental disability was severe enough that it might affect his ability to represent himself. As noted above, *Chabot* holds that once a defendant's potential or existing mental-health problems raise legitimate doubts about a defendant's mental condition, it is "incumbent upon the trial justice to conduct a more searching inquiry of defendant's then-existing mental health and physical condition." *Chabot*, 682 A.2d at 1380. Despite our holding in *Chabot*, the court failed to ascertain the nature and

extent of defendant's mental disability, much less did it order a competency evaluation that would have enabled it to independently assess whether defendant possessed the mental ability to understand what he was doing in purporting to waive counsel and in proceeding to trial *pro se*. Nor was there any inquiry by the court about whether defendant was aware of the potential sentencing he might face if he was convicted of the charge. As we noted in *Chabot*, "[i]n determining whether a defendant is making a knowing, an intelligent, and a voluntary waiver of his right to counsel * * * the following factors should be considered: * * * (3) the defendant's knowledge of the nature of the proceeding and the sentence that may potentially be [ ]imposed." *Chabot*, 682 A.2d at 1380.

"Because a defendant's knowledge and understanding of what he or she is doing is essential to effectuate a voluntary waiver of the right to counsel, an inquiry into the matter must sufficiently establish that knowledge and understanding on the record." *Id.* at 1381. In this case, given the defendant's mental-health disclosures, the court's inquiry fell far short of what *Chabot* required. Here, the trial justice was not faced with a defendant who merely disclosed that he was "off" his medication. *See Thomas*, 794 A.2d at 993.[1]

---

1. In *State v. Thomas*, 794 A.2d 990 (R.I.2002), we affirmed the Superior Court's denial of an application for post-conviction relief, rejecting the applicant's suggestion that his pleas of *nolo contendere* to rape, kidnapping, and assault and battery were invalid. The applicant had argued that he was mentally incompetent to plead *nolo contendere* at the time of the plea hearing and that the hearing justice had failed to address his alleged mental illness before accepting his plea—despite the applicant's disclosure to the court that "I have been off my medicine" in response to the hearing justice's inquiry about whether he was under the influence of any medication at the hearing. *Id.* at 992. We rejected that contention, however, because the hearing jus-

tice "methodically" conducted a plea hearing under Rule 11 of the Superior Court Rules of Criminal Procedure, finding in the end that the applicant possessed the requisite mental capacity to understand the nature of his plea. *Id.* at 993–95.

Unlike the case at bar, however, in *Thomas* the applicant did not suggest or present any evidence at the hearing that he may have been suffering from any mental impairment. Indeed, the applicant in *Thomas* did not do so until approximately three years after the hearing concluded, at which time he first alleged he was mentally incompetent. *Id.* at 994. Moreover, the expert evidence presented by the applicant in *Thomas* was insufficient to prove that he was in fact mentally incompe-

Rather, this defendant admitted to the court that he was a patient at a mental-health clinic and the court itself concluded that "some competent" official had diagnosed him with "some degree of mental disability." These facts triggered the need for the court to address and consider the six factors set forth in *Chabot,* and, if that inquiry and analysis raised further questions concerning the defendant's competency to waive counsel, the court should have ordered the defendant to undergo a psychiatric evaluation before passing on the waiver issue. Because the court failed to proceed in this manner, we must reverse and remand for further proceedings consistent with this opinion.

### Conclusion

For the above reasons, we deny the defendant's appeal in part and sustain it in part. We affirm the trial justice's denial of the motion to suppress. With respect to the adequacy of the court's mental-competency inquiry before accepting the defendant's waiver of his right to counsel, however, we sustain the appeal, vacate the conviction, and remand this case for a new trial and a hearing to determine the defendant's competency to waive counsel in accordance with this Court's *Chabot* decision, including obtaining a mental-competency evaluation of the defendant. If, after conducting such proceedings, the Superior Court determines that the defendant is competent to waive his right to counsel and to proceed to trial *pro se,* it shall appoint stand-by counsel and proceed to conduct a new trial. On the other hand, if the court determines that the defendant is

not mentally competent to waive counsel (but that he is competent to stand trial), the court shall deny the defendant's motion to proceed *pro se,* appoint counsel, and proceed to trial.

tent at the previous plea hearing. *Id.* at 995. Thus, in contrast to *Thomas,* in which the hearing justice found that "[t]here was not a scintilla of evidence that the [applicant] was laboring under a disability of any kind during the trial or the plea itself," *id.,* here, the evidence at the hearing showed that defen-

dant was receiving Social Security benefits for his mental-health problems and that he had been diagnosed with some type of undefined mental disability. These disclosures, we hold, were red flags that required the court to proceed according to *State v. Chabot,* 682 A.2d 1377 (R.I.1996).