STATE

v.

**Ralph DeMASI.**

STATE

v.

**Lawrence M. LANOUE.**

Nos. 78–35–C.A., 79–36–C.A.

Supreme Court of Rhode Island.

Aug. 29, 1980.

---

Dennis J. Roberts, II, Atty. Gen., Forrest L. Avila, Sp. Asst. Atty. Gen., for plaintiff.

John Tramonti, Jr., Providence, Griffin & Higgins, Kirk Y. Griffin, Geline W. Williams, Boston, Mass., for defendants.

## OPINION

BEVILACQUA, Chief Justice.

These are consolidated appeals from the defendants' convictions for breaking and entering in the nighttime with intent to commit larceny, in violation of G.L.1956 (1969 Reenactment) § 11–8–4, and with stealing goods valued in excess of $500, in violation of G.L.1956 (1969 Reenactment) § 11–41–1.

At approximately 4:10 a. m. on October 8, 1974, Officer Thomas Calabro of the Pawtucket police department was on routine patrol in an industrial section of the city when he noticed a 1968 Mercury at the intersection of Industrial Highway and Division Street. He noticed that the rear end of the car was heavily weighted down and that as the car turned left onto Division Street and crossed over some railroad

tracks, the back end scraped the tracks causing sparks to fly. He also noticed that as the car turned the back seat passenger looked at the police vehicle. At that point Calabro decided to stop the car. Because he temporarily lost sight of the car, however, Calabro radioed to Officer Raymond Zwolenski, another officer in the area, that he wanted the car stopped. A short time later, both Calabro and Zwolenski regained sight of the Mercury. When they neared the vehicle, the officers turned on their flashing lights, indicating to the car to stop, and the driver pulled over. Calabro approached the vehicle on the passenger's side, Zwolenski on the driver's side. When he reached the stopped vehicle, Zowlenski asked the driver, defendant Lawrence M. Lanoue, for his operator's license and vehicle registration papers. Lanoue produced a valid Rhode Island driver's license and registration card. Calabro and Zwolenski also requested identification from the two passengers, defendant Ralph DeMasi and Edward Sitko. DeMasi identified himself as "Raymond Massey" and gave his date of birth but could produce no identification. Sitko presented a valid Massachusetts driver's license although on another name. In spite of what appeared to be proper identification, the officers decided to extend the detention. The officers radioed police headquarters and requested a National Crime Information Center (NCIC) computer check on the three names. After about five minutes, headquarters reported the existence of an outstanding arrest warrant for Lanoue in Massachusetts.

After receiving the results of the warrant check from headquarters, the officers sent for a cruiser to transport the handcuffed Lanoue to the station. When the cruiser arrived, one of its officers, Daniel Haynes, identified Ralph DeMasi. DeMasi, who had previously identified himself as "Massey," was also taken into custody, handcuffed, and escorted into the cruiser, apparently for

giving false identification. Sitko, the other passenger, drove the Mercury to the station in the company of two police vehicles. Sometime later, at about 6 a. m., the Pawtucket police learned that during the night a burglary had occurred in the Regina Manufacturing Company, a manufacturer of jewelry. At about 9:30 a. m., a judicial magistrate issued a warrant to search the car based on an affidavit by Lt. Norman J. Moreau of the Pawtucket police detective division. When they pried open the locked trunk, the police discovered about 500 pounds of gold and silver jewelry findings later identified as part of 1,200 pounds stolen from the Regina Company earlier that morning.

Both defendants were indicted on April 4, 1975.[1] Both filed motions to suppress evidence seized from the Mercury, and DeMasi filed motions to dismiss for lack of a speedy trial.[2] Before DeMasi's trial in June 1977, his motions were heard and denied. He was convicted before a jury on June 15, 1977. The transcripts of DeMasi's hearings were incorporated into Lanoue's hearing on his motion to suppress. The trial justice denied the motion, which was heard on October 4, 1978, immediately prior to Lanoue's jury–waived trial at which he was also found guilty. Both defendants appealed, the appeals were consolidated, and exceptions to the rulings on the pretrial motions form the basis of the appeals.

I

Initially, we address DeMasi's argument that he was denied his right to a speedy trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by art. I, sec. 10 of the Rhode Island constitution.

The test for determining whether an accused has been denied his right to a speedy trial was set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.

---

1. The indictment also charged both defendants with possession of burglar tools in violation of G.L.1956 (1969 Reenactment) § 11–8–7. In both cases, however, the state dismissed this

count before trial pursuant to Super.R.Crim.P. 48(a).

2. Lanoue also filed a motion to dismiss but did not specify grounds for it.

101 (1972), and has been applied by this court in a number of recent cases. *See, e. g., State v. Delahunt,* R.I., 401 A.2d 1261 (1979); *State v. Roddy,* R.I., 401 A.2d 23 (1979); *State v. Crescenzo,* 118 R.I. 662, 375 A.2d 933 (1977). Courts confronted with lack of speedy trial claims are to consider four factors:

1. The length of the delay
2. The reason for the delay
3. The defendant's assertion of his right to a speedy trial, and
4. The prejudice to the accused.

None of the four factors alone is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barker v. Wingo,* 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118 (footnote omitted); *see State v. Paquette,* 117 R.I. 505, 509, 368 A.2d 566, 568 (1977).

### 1. Length of delay

■ DeMasi initially points out that thirty-two months elapsed between his arrest on October 8, 1974, and the beginning of his trial on June 13, 1977, and twenty-six months between the filing of the indictment on April 4, 1975, and the trial. A lengthy delay standing alone, however, is insufficient to establish that the right to a speedy trial has been violated. *State v. Crapo,* 112 R.I. 729, 734, 315 A.2d 437, 440 (1974). Nonetheless, we find a delay of twenty-six months between indictment and trial "presumptively prejudicial," a finding that triggers the necessity for an inquiry into the other three factors. *See Barker v. Wingo,* 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; *State v. Delahunt,* R.I., 401 A.2d at 1266; *State v. Roddy,* R.I., 401 A.2d at 30.

### 2. Reason for the delay

■ In *Barker v. Wingo, supra,* the Court set out general standards against which a trial court should consider and evaluate the proffered reasons for the delay:

"[D]ifferent weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117 (footnote omitted).

At the hearing on the first motion to dismiss for lack of speedy trial, held on March 2, 1977, the trial justice was informed that DeMasi was involved in five cases pending in the Superior Court, all initiated in 1975.[3] DeMasi was indicted in April 1975 on the charges concerning us here. For his alleged participation in the armed robbery of the Marquette Credit Union in Manville, Rhode Island, he was charged in May 1975 with, *inter alia,* conspiracy, armed robbery, and assault with intent to murder. In December 1975, he was charged by information with assault with intent to murder a fellow inmate at the Adult Correctional Institutions (ACI). And finally, on October 28, he was charged in two indictments in a multi-defendant conspiracy case of some complexity, which defense counsel conceded was "not going to be tried in this decade."

DeMasi does not deny that he had other business with the Attorney General's office; however, he argues that the other matters involved an amount of courtroom time insufficient to justify the delay: the Marquette Credit Union case involved only three days of evidentiary hearings in Feb-

---

**3.** It also appears in the record that in May 1975, DeMasi was surrendered over to Massachusetts authorities on charges pending in that state, although exactly how long he was held there is not clear.

ruary 1976, and the ACI assault case in November 1976 required only "ten days trial time." Against this background, he also insists that from the time of the arrest, the instant case was, from an investigatory and preparatory viewpoint, "open and shut." Therefore, handling this case and the other matters could not justifiably have required such a delay.

The state indicated at the initial hearing that the Attorney General had assigned priority to DeMasi's cases based on the gravity of the offenses charged. This policy seems to us neither unjustified nor unreasonable. The state's position is that the other cases were more serious and complex and that any delay was occasioned not by the few days of court time required but by the investigation and preparation of these matters, a position that DeMasi does not directly challenge. Although the record leaves us in some doubt regarding precisely how much investigatory and preparatory activity the other three matters stirred up during the period under consideration, we presume that, because they admittedly involved serious and complex charges, they consumed a substantial amount of investigatory and preparatory time on the state's part.

The record also indicates that defendant must share some responsibility for the delay. At the hearing on the first motion defense counsel admitted to being unavailable for trial in Rhode Island for five months during the delay because of his engagement in a protracted trial in Massachusetts not involving this defendant. Moreover, at the hearing on the second motion to dismiss for lack of speedy trial held on May 18, 1977, the trial justice observed that DeMasi had requested a continuance from March 22 to March 31, 1977, and that the instant case was not reached for trial on May 16, 1977, as scheduled, because defendant's attorney was engaged in federal court on another matter. Although the state's reasons for delay perhaps are not detailed on the record as fully as might be desired, we do not find any evidence of deliberate attempts to delay DeMasi's trial. Moreover, the reasons offered are at worst "neutral," and in light of the busy years DeMasi had in the Superior Court in 1975 and 1976, very possibly "valid." *See Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

### 3. Assertion of the right

Although DeMasi made an oral motion for a speedy trial on May 8, 1975, one month after his indictment, he did not file a written motion to dismiss for lack of a speedy trial until January 5, 1977, some twenty months later. After the first written motion was heard and denied, DeMasi filed a second motion to dismiss on May 9, 1977. We recognize that a defendant's assertion of his right to a speedy trial is entitled to strong evidentiary weight when a trial court is considering an alleged deprivation of that right. *See Barker v. Wingo*, 407 U.S. at 531–32, 92 S.Ct. at 2192–93, 33 L.Ed.2d at 117. DeMasi's assertion of that right, however, does not amount to the figurative "banging on the courthouse doors" that we found persuasive in *Tate v. Howard*, 110 R.I. 641, 656, 296 A.2d 19, 27 (1972).

### 4. Prejudice to defendant

Finally, we must assess the prejudice suffered by this defendant as a result of the delay. DeMasi maintains that he was a pretrial detainee at all times during the delay and that this detention was prejudicial because parole, work–release, and other rehabilitative opportunities were not available to him. *See State v. Crapo*, 112 R.I. 729, 736–37, 315 A.2d 437, 441 (1974); *Tate v. Howard*, 110 R.I. at 656, 296 A.2d at 28. At the hearing on the first motion to dismiss, defense counsel represented to the trial court that defendant had been confined at the ACI in staggered intervals for some fourteen out of the twenty–three months that had elapsed between his indictment in April 1975 and the hearing. Defense counsel also stated during the hearing that it would have been unfair to suggest that defendant's confinement had resulted solely from the instant indictment, a statement that leads us to infer that some portion of the period of pretrial detention had resulted from the other indictments, at least two of which concerned more serious charges than those at issue in this instant appeal.

Having considered all the factors and being persuaded by the state's reasons for the delay and by DeMasi's failure to assert his right promptly, we conclude that DeMasi was not denied his right to a speedy trial.

## II

We now turn to the contentions that defendants' motions to suppress should have been granted. These contentions require us to determine whether the stop of Lanoue's vehicle by the Pawtucket police was reasonable under the Fourth Amendment and art. I, sec. 6 of the Rhode Island constitution. In the proceedings below, the state put forth two alternative grounds as justification for the reasonableness of the stop. On appeal, defendants challenge both grounds; however, the state has argued only one of those grounds. Because the testimony of Officer Calabro inadequately establishes which ground he relied on, we have considered the reasonableness of the stop on both grounds.

The statute relied upon by the state on appeal to support the stop authorizes a peace officer to "detain any person * * whom he has reason to suspect is committing, has committed or is about to commit a crime * * *." General Laws 1956 (1969 Reenactment) § 12–7–1. Of course we must resolve the issue before us by deciding not whether the police conduct was authorized by state law, but whether it was reasonable under the Fourth Amendment. *Cooper v. California*, 386 U.S. 58, 61, 87 S.Ct. 788, 790, 17 L.Ed.2d 730, 734 (1967). The defendants strenuously contend that the stop violated the Fourth Amendment standards for reasonable governmental intrusions set out in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Supreme Court recognized that "[w]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" within the meaning of the Fourth Amendment.

*Id.* at 16, 88 S.Ct. at 1877, 20 L.Ed. at 903. Balancing the general governmental interest in effective crime prevention and detection against an individual's interest in freedom of movement, the Court held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906–07.

■ The state concedes that Officer Calabro did not have probable cause to stop the Mercury. Nevertheless, as *Terry* indicates and as we have recently discussed at length, probable cause is not necessary for temporary investigatory detentions. *State v. Halstead*, R.I., 414 A.2d 1138, 1145 (1980). In the interest of effective law enforcement, investigatory stops of individuals, either on foot, *see Terry v. Ohio, supra,* and *State v. Ramsdell*, 109 R.I. 320, 285 A.2d 399 (1971), in stationary vehicles, *see Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), or in moving vehicles, *see United States v. Montgomery*, 561 F.2d 875 (D.C. Cir. 1977), and *United States v. Robinson*, 536 F.2d 1298 (9th Cir. 1976), have been upheld if "based on a reasonable suspicion that the person detained is involved in criminal activity." *State v. Halstead*, R.I., 414 A.2d at 1145. In *Halstead*, we stated that "[t]he Court has also adhered to the requirement that a police officer's reasonable suspicion of criminal activity arise from specific and articulable facts and the reasonable inferences that can be drawn from them." *Id.* 414 A.2d at 1146.

■ Officer Calabro's decision to radio for assistance and to stop the vehicle was apparently based solely on the fact that at the time he first spotted the Mercury, the back of the car was overweighted and it struck the railroad tracks.[4] An overweighted appearance may result from other nor-

---

4. Officer Calabro testified that he had noticed the passenger in the back seat look at his police vehicle as the Mercury turned onto Division Street. While the dissent has placed some emphasis on this fact, we think that it is not unusual that a passenger might simply take note of a nearby police vehicle. *See United States v. Montgomery*, 561 F.2d 875, 879 (D.C. Cir. 1977).

mally innocent causes, such as a suspension system in need of repair. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 889–90, 95 S.Ct. 2574, 2584, 45 L.Ed.2d 607, 621 (1975) (Douglas, J., concurring). Of course, the sight of a heavily weighted car could combine with other specific objective facts, which taken together in certain circumstances might justify a reasonable suspicion. *Cf. Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (heavily weighted car, with several other facts, furnished probable cause). *See also State v. Halstead*, R.I., 414 A.2d at 1148 (listing several factors that may contribute to reasonable suspicion). On this evidence alone, however, we cannot say that at the time of the initial observation, Officer Calabro had sufficient "specific and articulable facts" which taken together with rational inferences from those facts reasonably warranted a suspicion that the occupants of the car were or had been engaged in criminal activity.

Furthermore, the officer could point to no additional circumstances occurring between the initial sighting and the actual stop which could be said to have raised his initial hunch to the level of a "reasonable suspicion." In fact, the reverse seems to be evident from the record. The officer testified that he was unaware of any burglaries having been committed in the area. He also testified that Lanoue's car was not exceeding the speed limit or proceeding substantially below the speed limit as in *Halstead*, that the taillights were working,

that there were no loud muffler noises, that the Mercury was not proceeding "erratically," that the driver made no attempt to elude the officers, and that at no time did Officer Calabro observe any other sort of traffic or vehicular violations. The Mercury was immediately pulled over when given the signal by the flashing lights on the patrol cars. The objective facts taken together could only support a mere inarticulate hunch that criminal activity was afoot. Such a hunch was insufficient under *Terry* and its progeny to justify the stop of Lanoue's Mercury.

Alternatively, in the proceedings below, but not on appeal, the state relied on two statutes, G.L. 1956 (1968 Reenactment) § 31–10–27 and § 31–3–9, as authority for the stop of the 1968 Mercury on October 8, 1974. Read together, these statutes authorize a police officer to stop a motor vehicle and to request of the driver an operator's license and vehicle registration card.[5] This court has construed these statutes to authorize such stops as part of the duty of the police to ensure compliance with this state's traffic safety laws. *See State v. Rattenni*, 117 R.I. 221, 224, 366 A.2d 539, 541 (1976); *State v. Wilson*, 110 R.I. 740, 744, 297 A.2d 645, 648 (1972); *State v. Maloney*, 109 R.I. 166, 173, 283 A.2d 34, 38 (1971). The defendants contend that to the extent that these cases suggest that the statutes authorize random, purely discretionary stops for license and vehicle registration checks, they are unreasonable under the standards of the Fourth Amendment and art. I., § 6.[6]

---

**5.** General Laws 1956 (1968 Reenactment) § 31–10–27 provides:

"License to be carried and exhibited on demand.–Every licensee shall have his operator's or chauffeur's license in his immediate possession at all times when operating a motor vehicle and shall display the same upon demand of any peace officer or inspector of the registry and shall, upon request by any proper officer, write his name in the presence of such officer for the purpose of being identified. However, no person charged with violating this section shall be convicted if he produces in court or the office of the arresting officer an operator's or chauffeur's license theretofore issued to him and valid at the time of his arrest."

General Laws 1956 (1968 Reenactment) § 31–3–9 provides in part:

"Registration card carried in vehicle.–(a) Every registration card shall at all times be carried in the vehicle to which it refers or shall be carried by the person driving or in control of such vehicle who shall display the same upon demand of a proper officer."

**6.** At the hearing on DeMasi's motion to suppress, the trial justice concluded that *State v. Maloney*, 109 R.I. 166, 283 A.2d 34 (1971), "clearly indicates that the officer, even without any specific reason to believe that the operator of the motor vehicle was committing a violation of law, had a right to stop that motor vehicle and ask for license and registration." He also stated that *Maloney, supra*, did not

■ We note at the outset that the Supreme Court has recently ruled that random, discretionary spot checks for license and registration carried out on public streets and highways are unreasonable under the Fourth Amendment absent "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law * * *." *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673 (1979). Therefore, to the extent that *Rattenni, Wilson*, and *Maloney*, all *supra*, impose no limits on the authority and discretion granted to police officers by § 31–10–27 and § 31–3–9, they are overruled by *Prouse*.

The stop at issue here occurred in 1974, more than four years before the *Prouse* decision. The defendants urge us, however, to apply the rule enunciated in *Prouse* retroactively and to invalidate the stop under the *Prouse* rationale. They contend that the court in *Prouse* did not establish a "sharp break in the line of earlier authority," *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 499, 88 S.Ct. 2224, 2234, 20 L.Ed.2d 1231, 1244 (1968), and that the decision, to a great extent, relied on and extended principles that had been growing and developing over the years. They also contend that retroactive application of *Prouse* would neither penalize police conduct unfairly nor unduly burden the administration of the criminal justice system. *See Linkletter v. Walker*, 381 U.S. 618, 637, 85 S.Ct. 1731, 1742, 14 L.Ed.2d 601, 613 (1965).

■ We need not resolve the question of retroactivity, however.[7] For even if we assume, *arguendo*, that before *Delaware v. Prouse, supra*, § 31–10–27 and § 31–3–9 authorized random, discretionary checks for driver's license and vehicle registration and that such checks were reasonable under the Fourth Amendment, we believe that the continued detention that occurred after Lanoue had produced valid documents was not reasonable under the circumstances. *See People v. McGaughran*, 25 Cal.3d 577, 586–87, 601 P.2d 207, 212–13, 159 Cal.Rptr. 191, 196–97 (1979); *cf. United States v. Brignoni–Ponce*, 422 U.S. at 881–82, 95 S.Ct. at 2580, 45 L.Ed.2d at 617 (border officers with reasonable suspicion may stop and question aliens, but further detention must be based on consent or probable cause). The record reveals no justification for the actions of the officers in continuing to detain the vehicle and its occupants for several minutes while they requested an NCIC warrant check and awaited the results. The absence of evidence of traffic or vehicular violations before the stop, coupled with the production of valid documents, denied the officers reason to suspect that any of the occupants were subjects of outstanding warrants. We therefore conclude that under these circumstances, the detention imposed for the period during which the officers were awaiting the results of the warrant check was an unreasonable governmental infringement of rights protected by the Fourth Amendment.

■ We have no doubt that Lanoue can attack both the stop and the detention

authorize the police to request identification from the passengers, a conclusion with which we concur; however, he did not find that the detention pending the warrant check was illegal.

7. Although we do not address the issue of the retroactive application of *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), we would point out that in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), which held roving–patrol stops of automobiles near the border unreasonable without any suspicion that a vehicle was carrying illegal aliens, the Court stated in a footnote,

"Border Patrol agents have no part in enforcing laws that regulate highway use, and their activities have nothing to do with an inquiry whether motorists and their vehicles are entitled, by virtue of compliance with laws governing highway usage, to be upon the public highways. Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops [unsupported by reasonable suspicion] as are necessary to enforce laws regarding drivers' licenses, vehicle registration, truck weights, and similar matters." *Id.* at 883 n. 8, 95 S.Ct. at 2581 n. 8, 45 L.Ed.2d at 618 n. 8.

pending the warrant check. He was the owner and operator of the vehicle, and it was he who was signaled to pull over and was required to produce proper documentation. He clearly has "standing" to challenge the alleged violations of his Fourth Amendment rights. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Another question remains, however— whether DeMasi, as a passenger in a motor vehicle stopped by police officers claiming to have justification for the stop, has "standing" to challenge the validity of the stop and the subsequent detention pending a warrant check.[8]

In a recent ruling on the Fourth Amendment "standing," the United States Supreme Court reemphasized that Fourth Amendment rights are personal and that in order to invoke the protection of the exclusionary rule, a defendant must demonstrate that governmental conduct has directly infringed his personal rights. *Rakas v. Illinois*, 439 U.S. at 133–34, 99 S.Ct. at 425, 58 L.Ed.2d at 394–95. Having rejected the "legitimately on the premises" test of *Jones v. United States, supra*, as "too broad a gauge for measurement," the Court now requires a defendant to show that he has a legitimate expectation of privacy in an invaded place "so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas v. Illinois*, 439 U.S. at 142, 99 S.Ct. at 429–30, 58 L.Ed.2d at 400.

Although the Court has stated in the context of warrantless searches that an individual has a lesser expectation of privacy in an automobile, *see, e. g., Arkansas v.* *Sanders*, 442 U.S. 753, 761, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235, 242–43 (1979); *United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538, 549 (1977); *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325, 335 (1974) (plurality opinion), the Court has nonetheless recognized that the occupants of a moving automobile retain a reasonable interest in personal privacy and has made no general *per se* distinction in the context of investigatory stops between the privacy interest of the owner or driver and the privacy interest of passengers. *See Delaware v. Prouse*, 440 U.S. at 662–63, 99 S.Ct. at 1400, 59 L.Ed.2d at 673.

On the facts before us, we believe that although the investigatory stop may have focused primarily on Lanoue as the operator of the vehicle, the officers effectively inhibited the free movement of all three individuals in the car to an equivalent extent. Furthermore, at the time Officer Zwolenski requested the documents from Lanoue, he also asked for identification from the two passengers. And the fact that the officers took the names of all three for the NCIC warrant check can leave but little doubt that each was being personally detained. We conclude that while traveling in the Mercury, all three shared a legitimate expectation that they would be free from the unreasonable governmental intrusion occasioned by the stop, the request for identification, and the warrant check. To hold otherwise here would be to draw artificial, formalistic distinctions not grounded in logic.[9] We therefore hold that the evidence seized as the result of the search of the Mercury should have been suppressed in the

---

8. The trial justice at DeMasi's hearing did not address this issue because he ruled that the initial stop was reasonable, and he also did not rule on the reasonableness of the subsequent detention. Rather, he ruled that there was no probable cause for DeMasi's arrest, an event that he found did not occur until after Officer Haynes had arrived and identified DeMasi. The trial justice concluded that (1) DeMasi had no "standing" to challenge the search of the trunk of Lanoue's vehicle, a search authorized by a warrant supported by an affidavit alleged to be defective, and (2) the fruits of the search

were not a proximate result of the illegal arrest and were therefore not suppressible on that ground.

9. We do not mean to suggest that all passengers in a motor vehicle will always have a legitimate expectation of privacy so as to be able to challenge a stop. This determination shall be made on a case–by–case basis, as the Court suggested in *Rakas v. Illinois*, 439 U.S. 128, 147, 99 S.Ct. 421, 432, 58 L.Ed.2d 387, 404 (1978).

trials of Lanoue and DeMasi as fruits of an illegal detention. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Montgomery*, 561 F.2d 875, 878 (D.C. Cir. 1977); *United States v. McDaniel*, 550 F.2d 214, 217 (5th Cir. 1977); *State v. Marshall*, R.I., 387 A.2d 1046, 1048–49 (1978).

In view of our conclusion that the stop was unreasonable, we do not address the defendants' other contentions.

The defendants' appeals are sustained, the judgments of conviction are reversed, and the cases are remanded to the Superior Court for further proceedings not inconsistent with this opinion.

WEISBERGER, J., did not participate.

KELLEHER, Justice, dissenting.

The majority's opinion, as far as it relates to the detention of Lanoue's vehicle, causes one to wonder whether it emanated from the same court that only two months ago decided the case of *State v. Halstead*, R.I., 414 A.2d 1138 (1980). In *Halstead*, an automobile–stop case, we also addressed the question of whether a police officer possessed an articulable and reasonable suspicion that the occupants of a motor vehicle were engaged in criminal conduct. Although I concede that my colleagues have correctly determined that this reasonable–suspicion test is applicable to the facts presented by the case before us, I believe that they have applied the test in a manner that runs contrary to both its underlying theory and purpose.

Following a lengthy review of the relevant cases, we concluded in *Halstead* that before a police officer may justifiably detain a vehicle for investigatory purposes, she or he must be able to articulate objective factors leading to a reasonable suspicion that " 'either the vehicle or an occupant is otherwise subject to seizure for violation of law.' " *State v. Halstead*, R.I., 414 A.2d at 1147, *quoting Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673 (1979). We also noted that this test, based on the pronouncements of

the United States Supreme Court in such cases as *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), is predicated upon a balancing of the governmental interest in crime prevention and detection against the right of an individual to be free from unwarranted police intrusion. In determining whether an officer possesses the requisite articulable facts and reasonable suspicion, we examine the totality of the circumstances, keeping in mind that the reasonable–suspicion standard should not be considered in a vacuum, but rather from the viewpoint of a "prudent, reasonable police officer in light of the facts known to him at the time of the detention." *State v. Halstead*, R.I., 414 A.2d at 1148.

Applying these legal principles to the facts presented in *Halstead*, we examined the actions of two officers of the Rahway, New Jersey, police department to determine if they were justified in detaining for purposes of investigation the vehicle in which the defendant was a passenger. While parked at an intersection in a high–crime area at 4:30 a. m., these officers observed the defendant and his companion traveling in a Ryder rental truck with Georgia plates. As they passed through the intersection at a speed of fifteen to twenty miles per hour below the speed limit, the two men stared at the police for approximately five seconds. The officers were surprised to see a rental truck in that area so late at night and thought that the speed of the vehicle was unusual. Suspecting that something was up, the officers followed the truck for a short distance before directing the driver to pull it over to the side of the road.

The incorporation of these circumstances into the reasonable–suspicion test led to our conclusion that

"[t]hese facts, when considered from the vantage point of an experienced police officer whose duty it is to be attuned to unusual circumstances, could very well create a reasonable suspicion that the occupants of the truck were engaged in

some sort of criminal activity. The personal knowledge and experience of the officers are important factors that may allow an officer reasonably to infer from observation of otherwise innocuous conduct that criminal activity is imminent or is taking place. In light of the officers' knowledge of the character of the neighborhood and of the usual traffic patterns for that time of night, as well as the unusual behavior of the occupants, we believe that their suspicions were reasonable. * * * Given the reasonable suspicion that the officers possessed, in this instance the state's interest in crime detection outweighed the individual's right to be free from the intrusions on his liberty that accompanied the investigatory stop." *Id.* 414 A.2d at 1148–49.

Comparing the facts of *Halstead* to those of the case before us, I am of the firm belief that the articulable facts available to Officer Calabro prior to his detention of Lanoue's automobile make out a stronger case for reasonable suspicion than did those facts available to the New Jersey officers. At four o'clock in the morning, Calabro was traveling east on Division Street in the industrial area of Pawtucket when he observed three men in a 1968 Mercury driving south on Industrial Highway. The vehicle pulled out in front of him, turned left onto Division Street, and crossed over a set of railroad tracks. Calabro surmised that the Mercury was heavily loaded, for the back end scraped the tracks, causing sparks to fly. As the Mercury proceeded over the tracks, a passenger in the back seat looked back at the patrol car. His suspicions aroused, Calabro attempted to follow this vehicle as it proceeded to the end of Division Street and turned right onto York Avenue. Calabro testified that he waited for a truck to pass and proceeded to York Avenue, but

"the vehicle had vanished. I couldn't find it. * * * I took the first left off York Avenue, went down to Burgess Street, and it just happened that their vehicle came out two streets * * * farther south than mine, but running parallel with me. * * * At that time they took a right and I took a right and they took a left. I also took a left, and we proceeded now toward Newport Avenue."

During these maneuvers, Calabro noticed that the passenger in the back seat continued to turn around and look back. Calabro stated that before he signaled the vehicle to pull over, it appeared as though the driver was attempting to elude him.

Thus, in this case the officer observed three men in a heavily laden vehicle traveling at 4 a. m. in an industrial area. Although the majority refers to these facts in the opinion, it overlooks the fact that the back–seat passenger, after his initial backward glance, continued to look back at the patrol car, as well as Officer Calabro's belief that the Mercury was attempting to elude him. Given the set of circumstances described by Calabro under oath, I am perplexed by the majority's statement that Calabro's decision to stop the vehicle was "apparently based *solely* on the fact that at the time he first spotted the Mercury, the back of the car was overweighted and struck the railroad tracks." (Emphasis added.) This conclusion must be considered in light of the majority's comment that "[o]f course, the sight of a heavily weighted car could combine with other specific objective facts, which taken together in certain circumstances, could support a reasonable suspicion." This comment takes on added significance when one considers the numerous factors related by Officer Calabro in describing his efforts to keep the Mercury under surveillance as he and Lanoue played a game of motorized hide–and–seek.

Measuring the suppression–hearing evidence against the standards set forth in *Halstead* and the United States Supreme Court cases upon which this decision rests, I can only conclude that an officer such as patrolman Calabro could reasonably suspect that the trio in the Mercury were leaving with the loot after burglarizing one of the many manufacturing plants located within this particular section of Pawtucket. The views expressed by the majority cast a substantial shadow over our pronouncements in

*Halstead*, wherein we stressed that the totality of the circumstances must be examined from "the vantage point of an experienced police officer whose duty it is to be attuned to unusual circumstances * *." *See United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

Officer Calabro typifies the "experienced police officer" alluded to in *Halstead*. The record indicates that at the time he detained Lanoue and DeMasi he had been patrolling the streets of Pawtucket for seven years. At the suppression hearing, he told the Presiding Justice that when the names of the three detainees were transmitted to NCIC, "it came back a hit on Mr. Lanoue." Calabro's "hit" language and his seven years on the street qualified him, in my opinion, as one of those officers who, because of their experience, can reasonably "infer from observation of otherwise innocuous conduct that criminal activity is imminent or is taking place." I submit that police officers attempting to distinguish *Halstead* from this case will find themselves in the same state of bewilderment which gave rise to this dissent.

A final comment is directed toward the majority's conclusion that once Lanoue had produced an apparently valid license and registration and the passengers had identified themselves, the officer's further detention of the suspects pending a warrant check was an unreasonable intrusion upon their Fourth Amendment rights. Since I have taken the position that Officer Calabro did indeed possess a reasonable suspicion that the occupants of the vehicle he detained were involved in criminal activity, I cannot agree that either the warrant check or the five–minute time period required to conduct it was impermissible. *Terry v. Ohio* and its progeny contemplate that once an officer has a reasonable suspicion that criminal activity is afoot, a brief investigatory stop is proper in furtherance of the governmental interest in crime detection and prevention. The length of the detention cannot be measured with stopwatch precision but must depend on the practicalities of the particular situation. Officer Calabro conducted a brief investigation in order to verify the identities of the three men and to determine whether any of them were subject to an outstanding warrant. The time required to complete this check is necessarily limited by our present state of technology, and I do not believe that the five–minute period spent at curb side while awaiting the results of the 4 a. m. check was such an unreasonable length of time as to constitute a violation of the suspects' Fourth Amendment rights.