STATE

v.

Ralph DeMASI.

STATE

v.

Lawrence M. LANOUE.

Nos. 78–35–C.A., 79–36–C.A.

Supreme Court of Rhode Island.

July 29, 1982.

Reargument Denied Sept. 9, 1982.

Dennis J. Roberts, II, Atty. Gen., for plaintiff.

Griffin & Higgins, Kirk Y. Griffin, Geline W. Williams, Boston, Mass., John Tramonti, Jr., Providence, for defendants.

## OPINION

KELLEHER, Justice.

The opinions expressed herein are our response to the June 15, 1981 order of the United States Supreme Court[1] directing this court to reconsider its holding in *State v. DeMasi*, R.I., 419 A.2d 285 (1980), in which a majority of this court vacated the defendants' convictions for breaking and entering in the nighttime on the ground that the convictions resulted from the use of evidence that should have been suppressed as the fruit of an illegal detention. In its order directing reconsideration, the Supreme Court specified that our review be conducted in light of its recent ruling in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Before discussing *Cortez*, it is proper that we give a brief resume of the pertinent evidence that caused the Supreme Court to order us to reevaluate this court's suppression of evidence which unquestionably caused the guilty verdicts to be returned against the defendants, Ralph DeMasi and Lawrence M. Lanoue.

At approximately 4:10 a. m. on October 8, 1974, Patrolman Thomas Calabro of the Pawtucket police department was on motorized patrol in the industrial area of Pawtucket, traveling east on Division Street. As Calabro approached the intersection of Industrial Highway and Division Street, he noticed a 1968 Mercury sedan that had been traveling south on Industrial Highway pull out in front of his car and turn left onto Division Street. As the Mercury turned, it crossed over a set of railroad tracks which were embedded in the surface of Industrial Highway. The vehicle's rear portion was so close to the ground that a visible spray of sparks was given off as the car's rear came in contact with the tracks' rails. As the vehicle, occupied by three individuals, began to proceed along Division Street, Calabro noticed that a passenger in the vehicle's rear seat looked back at his patrol car. The heavily laden back end of the Mercury, the spray of sparks, and the backward glance of the passenger, all joined to arouse the suspi-cions of Calabro, an officer who at that time had seven years' experience on the force.

Calabro attempted to follow this vehicle as it continued down Division Street and turned onto York Avenue. He was forced to wait for a truck to proceed before he could follow. When he turned his patrol car onto York Avenue, the Mercury, he stated, "had vanished." Calabro then took a left off York Avenue and sighted the Mercury two streets farther south, running parallel to his own position. The driver of the Mercury made a right turn, and Calabro made a right to follow it. The Mercury then turned left, Calabro turned left, and both vehicles proceeded toward Newport Avenue. The officer noted that during the course of this pursuit, the passenger in the back seat "kept looking back" at the patrol car. He testified that from his vantage point it appeared to him that the driver of the vehicle was attempting to elude him.

When Calabro had initially lost sight of the vehicle, he had radioed another police officer also patrolling in that vicinity for assistance in stopping the vehicle. Shortly after the Mercury had turned southward onto Newport Avenue, both patrol cars met up with the vehicle and turned on their flashing lights, whereupon the Mercury's driver pulled the vehicle over and stopped. The stop occurred after the Mercury had turned left, had crossed over Newport Avenue, and had come to a halt at the intersection of Manton Street and Courtney Avenue. Lanoue, the driver, at the officers' request, produced what appeared to be a proper driver's license and registration card. Seated alongside Lanoue was DeMasi. The back-seat passenger was Edward Sitko. DeMasi identified himself as "Raymond Massey" but offered no corroborating documentation. Sitko identified himself as Robert Riley as he displayed a Massachusetts driver's license that bore that name.

At this juncture, the officers radioed police headquarters and asked the National Crime Information Center (NCIC) for a

---

**1.** *See Rhode Island v. DeMasi*, 452 U.S. 934, 101 S.Ct. 3072, 69 L.Ed.2d 948 (1981).

check on the possibility of any outstanding warrants against "all three subjects." It took only about five minutes to receive a response. The police officers testified that Lanoue "came back as a hit"; he was wanted by the Massachusetts State Police. In light of this information, a cruiser was dispatched to transport Lanoue to the station. One of the officers who arrived in the transport cruiser identified "Massey" as DeMasi, and DeMasi was taken into custody along with Lanoue.

When DeMasi left the vehicle to be taken into custody, Officer Calabro observed pieces of "jewelry"—unfinished metal,—gloves, and a screwdriver on the front-seat floor of the vehicle. Sitko, accompanied by the two police cruisers, drove the Mercury to the police station.

At approximately 6 a. m. the Pawtucket police learned that the Regina Manufacturing Company, a manufacturer of jewelry, had been burglarized that evening. Later, after obtaining a warrant, the police opened the Mercury's trunk, and there, for all to see, were 500 pounds of gold and silver jewelry findings. The findings were later identified as a portion of 1,200 pounds of similar loot taken from the jewelry manufacturer.

The legal standard enunciated by the Supreme Court in *Cortez*, by which we must now, on reconsideration, assess the propriety of the police officers' stop of the Mercury and defendants' detention, requires that we make our determination in view of the "totality of the circumstances—the whole picture." It is this whole picture that must have led the detaining officers to a "particularized and objective basis for suspecting" that the occupants of the vehicle were engaged in criminal activity. *United States v. Cortez*, 449 U.S. at 417, 101 S.Ct. at 695, 66 L.Ed.2d at 629.

▇ The Court described the concept of a "particularized suspicion" as comprised of two components, both of which must be satisfied for a stop to be permissible:

"First, the assessment [leading to the requisite degree of suspicion] must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

"The process does not deal with hard certainties, but with probabilities. * * * Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.* at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629.

The Court further emphasized that in reviewing the perceptions of the detaining law-enforcement officers, it is imperative to recognize that objective facts observed by such officers, although "meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *Id.* at 419, 101 S.Ct. at 695, 66 L.Ed.2d at 629.

▇ When we apply the *Cortez* criteria to the facts to which we have just referred, we reach the conclusion that the stop of the Mercury was based upon a reasonable suspicion that resulted from the events that occurred before Calabro's eyes as he and the Lanoue-DeMasi-Sitko trio played an early-morning motorized game of hide-and-seek along Pawtucket's deserted highways on October 8, 1974.

With the totality-of-circumstances concept as our guide, we note the following sequence of events: Calabro sees a heavily laden motor vehicle traveling in a highly industrial area in the early hours before

dawn; the night is illuminated by sparks flying from the railroad tracks as the back end of the vehicle, in Calabro's words, "was banging the tracks"; the back-seat passenger continues to turn around periodically and keeps the cruiser under observation; and as the Mercury makes its way through Pawtucket's highways and byways, it appears to Calabro that the trio is attempting to elude him. Calabro in his seven years of patrolling the Pawtucket highways, is at this time the type of officer whom this court in *State v. Halstead*, R.I., 414 A.2d 1138, 1148–49 (1980), unanimously described as capable of making a reasonable inference from observations of otherwise innocuous conduct that criminal activity is imminent or taking place. In summary, we believe, therefore, that Calabro's decision to stop the Mercury sedan was amply justified in light of the events that continued to unfold before him from the moment he first encountered the Mercury at the railroad intersection.

Against the backdrop of the events that occurred before the Mercury sedan was stopped, it was reasonable that Officer Calabro's suspicions were in no way allayed by his initial contact with Lanoue and his companions. Under the totality-of-the-circumstances test, we think it was entirely appropriate for the officer to detain the trio further for the brief time necessary to conduct an NCIC warrant check. Moreover, we do not consider the five-minute warrant check an unreasonable intrusion on the trio's Fourth Amendment rights.

WEISBERGER, J., did not participate.

BEVILACQUA, Chief Justice, dissenting.

Because I fail to perceive how the "totality of the circumstances" standard set forth in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), undermines this court's original decision in *State v. DeMasi*, R.I., 419 A.2d 285 (1980), I must dissent. The requirement that the "whole picture" (including the knowledge and experience of the detaining officer) be considered in determining the propriety of an investi-

gatory stop is no revelation to this court,[2] and in our original decision in *DeMasi* we obviously adhered to that standard of review. Taking the officer's experience into account, however, does not alter the fact that the officer "must have a *particularized and objective basis* for suspecting the particular person stopped of criminal activity." (Emphasis added.) *United States v. Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 695, 66 L.Ed.2d at 629. The mere fact that an officer is experienced does not require a court to accept all of his suspicions as being reasonable, nor does his experience and training necessarily mean that the officer's perceptions are justified by the objective facts. *United States v. Buenaventura-Ariza*, 615 F.2d 29, 36 (2d Cir. 1980).

I believe that the facts in this case, even when viewed through the experienced eyes of Officer Calabro, simply do not form a particularized and objective basis for suspecting that defendants were involved in criminal activity. The officer testified that his decision to stop the vehicle was based on the following two factors: (1) the back of the car was so low that it struck the railroad tracks, prompting him to surmise that the trunk was heavily laden; and (2) the back-seat passenger looked back at the patrol car. I am of the belief that the mere fact that a car is heavily laden does not give rise to a fair inference that the contents therein are the product of criminal activity. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 889–90, 95 S.Ct. 2574, 2584, 45 L.Ed.2d 607, 621 (1975) (Douglas, J., concurring). Moreover, as Officer Calabro admitted in his testimony, an overweighted appearance may result from other normally innocent causes, such as a suspension system that is old or in need of repair. *Id.* Similarly, the passenger's backward glances at the patrol car hardly constitute an objective basis for suspicion of criminal activity. People simply do take notice when a police car is nearby or is following their vehicle. The act in itself is wholly innocuous and unrelated to any criminal activity. *See*

---

2. *See State v. Halstead*, R.I., 414 A.2d 1138, 1148 (1980).

*United States v. Montgomery*, 561 F.2d 875, 879 (D.C.Cir.1977); *cf. State v. Frazier*, R.I., 421 A.2d 546, 550 (1980) (nervous demeanor of motorist stopped at night by police officer is meaningless in determining existence of probable cause for arrest).

I do not dispute that these facts may have constituted sufficient reason for the officer to keep an eye on the vehicle; nor do I deny that these circumstances could be combined with other objective facts to justify a reasonable suspicion of criminal activity. *Cf. Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (heavily laden car, along with other facts, furnished probable cause for arrest). In this case, however, the officer could point to no additional facts between the initial sighting and the actual stop that could be said to have raised his initial hunch to the level of "reasonable suspicion." The officer testified that he had heard no radio reports of criminal activity in the vicinity. He also stated that the vehicle was not exceeding the speed limit or proceeding substantially below the speed limit, nor was it proceeding erratically. At no time did he observe any other sort of traffic or vehicular violations, and the driver pulled the vehicle over immediately when given the signal by the flashing lights on the patrol cars. All of these facts would tend to allay an officer's initial suspicions, not confirm them.

The majority places great emphasis on the fact that the officer believed that defendants were trying to elude him, terming the events of that morning a "motorized game of hide-and-seek." The officer himself, however, testified that he was unsure about whether or not they were attempting to evade him. He stated that he originally lost sight of the vehicle because he had waited for a trailer truck that was traveling approximately forty yards behind defendants' vehicle to pass. He further testified that at no time did he observe the vehicle accelerate or change its general

course of direction. The majority's firm conclusion that defendants were playing a game of "hide-and-seek" with Officer Calabro, therefore, is not supported by the record.

I believe that, looking at the whole picture, the objective facts available to Officer Calabro were such that his level of suspicion could amount to nothing more than a mere hunch that defendants were engaging in criminal activity. Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, such a hunch may not justify the seizure in this case.

Even assuming *arguendo* that the stop was valid, I believe that once Lanoue produced a valid license and vehicle registration, the continued detention that occurred was not reasonable under the circumstances. *See People v. McGaughran*, 25 Cal.3d 577, 586–87, 601 P.2d 207, 212–13, 159 Cal. Rptr. 191, 196–97 (1979); *cf. United States v. Brignoni-Ponce*, 422 U.S. at 881–82, 95 S.Ct. at 2580, 45 L.Ed.2d at 617 (border officers may stop and question aliens based on reasonable suspicion, but further detention must be based on consent or probable cause). Because there had been no evidence of traffic or vehicular violations before the stop and valid documents had been produced, the officers had no reason to believe that the occupants were the subjects of outstanding warrants. Thus, I would conclude that the detention for the period during which the officers were awaiting the results of the warrant check was an unreasonable governmental infringement of rights protected by the Fourth Amendment.[3]

### ORDER

The above-entitled appeals having been reconsidered in compliance with an Order of the United States Supreme Court issued on June 15, 1981, 452 U.S. 934, 101 S.Ct. 3072, 69 L.Ed.2d 948, it is hereby ordered and decreed that the mandate previously en-

---

**3.** It should also be noted that DeMasi's arrest, which occurred when he was taken into custody was illegal. *See State v. Frazier*, R.I., 421 A.2d 546, 549 (1980). At that time, the officers had no reason to believe that DeMasi had committed any crime.

tered in *State v. DeMasi*, R.I., 419 A.2d 285, 294 (1980), is hereby vacated, and the mandate shall now read:

The defendants' appeal is denied and dismissed, the judgments of conviction are affirmed, and the cases are remanded to the Superior Court.

